BANK OF LOUISVILLE *v.* ANDREW SMOTHERS, ET AL.

**Attachment—Indorser and Surety.**
> The absence of principals from the state is a ground for an attachment against the property of an endorser or surety not absent from the state or participating in any fraud.

**Surety Liability.**
> A surety undertakes to pay the debt of his principal and does it with the knowledge that the law will authorize an attachment against his property if his principal does any of the acts which the law declares shall authorize such a proceeding.

APPEAL FROM MONTGOMERY CIRCUIT COURT.

January 6, 1876.

OPINION BY JUDGE COFER:

The appellee, Andrew Smothers, was bound as indorser and surety for the Lanes for large sums of money. About January, 1870, the Lanes, who it seems were large traders in stock to the southern market, left the state with a large number of mules to be sold in the south. About the 1st of February of that year their creditors began to sue out attachments against them and their surety, Smothers, on the ground that they and he had removed a material part of their property out of this state, not leaving therein enough to satisfy their debts, that they had left the county of their residence to avoid the service of process, and so concealed themselves that process could not be served on them, and were fraudulently selling their property or permitting it to be sold to cheat, hinder and delay their creditors.

All the grounds of attachment were denied; enough was proved, however, to warrant the attachments against Lane; but in the

opinion of this court the evidence fails to show any act of Smothers authorizing the attachments against him.

On the 4th of January, 1872, Joseph Smothers and others, children of A. Smothers, filed their petition, claiming to be the owners of twenty-four mules attached as the property of their father, and which they claimed had been purchased with money belonging to them, which was in the hands of their father as their guardian. They also claimed that between 1857 and 1859, their father had purchased a tract of land of one Gudgell, and that their maternal grandfather had furnished $3,800 towards paying for it under an agreement between him and their father that the title to so much of the tract as that sum would pay for should be secured to them. They likewise claimed that their grandfather furnished $500, to be used toward paying for another tract of land purchased by their father, with the distinct understanding and agreement that as much of said land as said sum would pay for was to be conveyed to their mother. This they say occurred as much as twenty years ago.

They alleged that their mother was dead, and that their father had taken the title to both tracts to himself without the knowledge or consent of their mother or of themselves. The petitioners were all infants when these things occurred; and all, except one, were infants or married women when the petition was filed and during the prior pendency of these suits. They asked to have so much of the land purchased of Gudgell as $4,300 would pay for at the purchase price, which was $57.50 per acre, adjudged to them.

The circuit court on final hearing adjudged the mules and $4,300 worth of the land at the purchase price to the petitioners, and also adjudged to Andrew Smothers a homestead in the tract on which he resided. From these judgments the Bank of Louisville and Northern Bank of Kentucky prosecute this appeal, and Andrew Smothers prosecutes a cross-appeal to reverse the order sustaining the attachments.

As only the two banks are appellants, the cross-appeal does not call in question the correctness of the order sustaining the other attachments. The matter of the homestead may be readily disposed of. Smothers by an appropriate petition, claimed the exemption, and the plaintiffs admitted that he was a bona fide housekeeper, and the evidence is sufficient to show that he was residing on the land.

The evidence tends to prove that the mules attached were purchased with funds belonging to his children, in the hands of A. Smothers as their guardian. A short time before the attachments

were sued out it is claimed that the mules were surrendered to Joseph Smothers, one of the children who had about that time arrived at 21 years of age, to be fed and sold, and the proceeds to be divided between himself and his brothers and sisters. The mules had been purchased by and were in the possession of A. Smothers from one to two years before the alleged surrender of them to Joseph, and they continued on his farm afterwards without any visible change of possession, and were there when they were seized under the attachments about the first of February, 1870.

Joseph did not disclose the claim afterward asserted, but undertook with the sheriff to keep the mules, and did so, and afterwards presented to the court his account for keeping them, and was present when the amount to be paid him was fixed by the court; and his father was sworn as a witness on that occasion, as we suppose, on the question of the amount of compensation to be paid; but neither on that occasion or on any other, as far as the record shows, until the presentation of the claimant's petition nearly two years after the mules were levied on, was made known the claim of the children. Joseph bought the mules when sold under an order made by the county judge and paid for them before filing their petition.

The mules cost, as Andrew Smothers testifies, about $1,320, and from the time of the purchase to about or a little before the time it is claimed they were surrendered to Joseph, they seem to have been kept at the cost of the father.

As between Andrew Smothers and the children, it may be that their money having been invested in the mules they would be entitled in equity to the increase in their value, paying the actual cost of keeping them; but as against Andrew Smothers's creditors, they are at most only entitled to the cost of the mules. As to that sum, Andrew Smothers held the mules in trust for his children because of his misappropriation of their money in purchasing them; but whatever increase in value may have been produced by feeding and pasturing them belongs in equity to Smothers's creditors; and the court, therefore, erred in adjudging to the appellees more than the cost of the mules.

So far as the claim for the $500 alleged to have been furnished by Potts to aid in paying for the one hundred acres of land is concerned, we think the appellees failed to make out their case. They do not allege that it was furnished to pay for the Gudgell land, or that there was any subsequent arrangement to have it secured in

that tract, and there is no sufficient evidence to sustain the allegation if made.

As to the $3,800 alleged to have been furnished by Potts toward paying for the Gudgell tract, the evidence is somewhat stronger. Gordon testifies that he wrote for Andrew Smothers, in 1859, an instrument to secure to his, Smothers's, children some $4,000, more or less. Ledford swears that in 1859 or '60 he heard Andrew Smothers read a deed from himself to his children for a part of a tract of land called the English land, which we understand to be the same as the Gudgell land; that the impression left upon his mind by the reading of the deed was that it conveyed to them land to the amount of money furnished by their grandfather Potts, toward paying for it. He says Andrew Smothers then said that he had agreed with Potts to lay out the money for land for the benefit of his children, and that he then gave the deed to his eldest son, James, and charged him to have it recorded. (Ledford is brother-in-law to A. Smothers and uncle to his children.)

James Smothers, brother to Andrew, says he was present when the deed was written by Gordon, and says that he understood at the time that it was for the Gudgell land, and that it was bound to the children for the amount furnished by Potts, which, as near as he can recollect, was said to be about $4,300. He also understood that the shares of such of the children as died should go to the survivors.

Andrew Smothers testified that after the death of his wife, James Potts furnished him $3,800 toward paying for the Gudgell land under a distinct understanding and agreement that so much of the land as that sum would pay for was to be secured to the children; and he thinks the $500 before referred to were embraced in the agreement; that he was to give the children a deed or lien on the land for $4,300, which he did; that he made a deed deeding the land to them for the amount of money; and that the names of the children were mentioned in the deed, and it provided that if any of them died without will or under age the share of that one should go to the others. He also proves that he delivered the writing to his son, James, and directed it to be recorded, but he had failed to have it recorded; that James was dead and the deed could not be found.

No reference is made to this deed in the petition of appellees, but it is satisfactorily established that there was a writing of some kind, either conveying to the children a portion of the land equal to the proportion of the purchase money furnished by their grandfather, or giving them a lien on it to secure that amount. We incline to the

opinion that the writing was a deed conveying to the children as much of the land as the $5,800 would pay for at $57.50 per acre, and the court did not err in adjudging to them that quantity of land.

The deed, when signed by Andrew Smothers and delivered to James, operated to invest the grantees with at the least an equitable title to the land intended to be conveyed. The deed not having been recorded would have been invalid as to any bona fide purchaser for value without notice, but the failure to record the deed did not divest the equity created by it; and notice of that equity having been brought home to the appellants before they had succeeded in acquiring a legal title to the land or its proceeds, they cannot now recover it over the superior equity of the grantees in the deed. This was in effect decided in *Low & Whitney v. Blinco, et al.,* 10 Bush 331.

The only remaining question is whether the attachments sued out by the appellants were properly sustained. As already stated, the evidence fails to show any fact which authorized an attachment against Andrew Smothers alone, but it shows abundant grounds as against the Lanes, who were jointly bound with Smothers, and seem to have been principals in the debts. The question is thus presented whether the acts of the Lanes, although sufficient to warrant attachments against their property, will also be sufficient to sustain an attachment against the property of Smothers.

It is maintained that they will not, (1) because the attachments against Lane have been discharged under an adjudication in bankruptcy, (2) because the statute does not authorize an attachment against one obligor on account of acts done by another, and (3) because if the statute does so provide it is unconstitutional.

Within less than four months from the date of the attachments against Lanes they were adjudged to be bankrupts, and on the motion of their assignee the attachments were discharged as to them and their property. The grounds for the attachments having been shown by the evidence to have existed when they were sued out, it is not perceived how the subsequent discharge of the attachments under the bankrupt law can affect the question whether attachments against the property of Smothers were authorized on account of acts of his co-obligors. If the attachments can be sustained against Smothers it must be on account of the existence of the facts which authorized attachments against Lane; and the right to the attachment against him having once existed, it cannot be lost on account of the bankrupt law, which operated alone upon the attachment against Lane.

Whether the statute authorizes an attachment against one co-obligor on account of acts done by another is a question of more difficulty. Sec. 221, of the Civil Code provides that the plaintiff in a civil action may have an attachment against the property of the defendant in the cases, and upon the grounds here stated: In an action for the recovery of money, where the action is against

1. A defendant or several defendants, who, or some one of whom, is a foreign corporation or a non-resident of the state.

2. Who has been absent from the state for four months.

3. Who has departed from the state with intent to defraud his creditors.

4. Who has left the county of his residence to avoid the service of a summons.

5. Who so conceals himself that a summons cannot be served upon him.

6. Who is about to remove or has removed his property, or a material part thereof, out of this state, not leaving enough therein to satisfy the plaintiff's claim or the claims of said defendant's creditors.

7. Who has sold, conveyed or otherwise disposed of his property, or suffered or permitted it to be sold, with the fraudulent intent to cheat, hinder or delay his creditors.

8. Who is about to sell, convey or otherwise dispose of his property with such intent.

By an amendment to this section approved March 10, 1856, it is provided that the non-residence of one or more defendants shall be no cause for attachment against the separate property of any of the defendants who are residents of this state. This amendment would seem to be a legislative construction of the provisions of Sec. 221, and the legislature having amended that section so as to prevent the non-residence of a part of the defendants from being made grounds for an attachment against those who are residents, seems clearly to indicate the purpose of that branch of the government to authorize an attachment against the property of all the defendants, whenever any one of them had been guilty of an act which, under sub-divisions 2, 3, 4, 5, 6, 7, 8, authorizes an attachment against his property; and it was so held by this court in *Mills v. Brown, et al.,* 2 Met. 404. That case was decided in 1859, yet no change has been since made in the statute, and we feel, therefore, that the question is concluded so far as the courts are concerned; and

if the rule be harsh or unjust the legislature, and not the judiciary, must provide the necessary modification.

Because we feel that the subject is concluded by legislative as well as judicial construction, and for that reason alone, we must hold that the grounds for the attachment were fully made out. We do not think the statute is unconstitutional. The legislature has power to regulate the remedy of suitors, and may make such acts as it chooses to designate grounds for attachment; indeed it might authorize an attachment whenever a debt is past due, without requiring the allegation or proof of any other fact. The surety undertakes to pay the debt and he undertakes it with a knowledge that the law will authorize an attachment against his property if his principal shall do any of the acts which the law has declared shall authorize such a proceeding, and however harsh the remedy may seem, it is one the legislature had undoubted power to give.

We are, therefore, of the opinion that the judgment must be affirmed on the cross-appeal. But on the original appeal the judgment must be reversed, and the cause is remanded with directions to subject the proceeds of the sale of the mules in excess of $1,320, and all the land known as the Gudgell tract except so much as $3,800 will pay for at $57.50 per acre. The judgment setting apart a homestead to Andrew Smothers is *affirmed*.

*Apperson & Reid, A. Duvall, for appellant.*
*Turner & Corneilson, Nesbitt & Gudgell, for appellees.*